ALEXANDER et al. v. FIDELITY TRUST CO. et al.

(District Court, E. D. Pennsylvania. March, 1915. Opinion sur Trial Hearing on Accounting. February 8, 1917.)

No. 1385.

1. WITNESSES ⬅112—COMPETENCY—PERSONS INTERESTED IN EVENT—ASSIGN-MENT OF INTEREST—"RELEASE"—"EXTINGUISHMENT."

A bona fide assignment of his interest in the subject-matter of a suit renders a witness, otherwise disqualified for interest, competent under Act Pa. May 23, 1887 (P. L. 160) § 6, which provides that an interested witness may become competent by a bona fide "release or extinguishment" of his interest.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 425–475; Dec. Dig. ⬅112.]

2. EXECUTORS AND ADMINISTRATORS ⬅315(6)—DISTRIBUTION DECREE—CON-CLUSIVENESS.

A probate court, in the administration of an estate, is without authority to pass upon conflicting claims of title to property, where one of the titles set up is adverse to the estate, and a decree distributing as assets of an estate property claimed by another is not conclusive on the adverse claimant.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. § 1309; Dec. Dig. ⬅315(6).]

3. TRUSTS ⬅365(2)—SUIT TO ENFORCE—LACHES.

The beneficiary of a trust, who did not obtain knowledge until several years after the death of the trustee of facts showing that he had in effect repudiated the trust in his lifetime, held, under the facts shown, not barred by laches from maintaining a suit to enforce the trust against his executor.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 571; Dec. Dig. ⬅365(2).]

4. TRUSTS ⬅305—ACCOUNTING BY TRUSTEE—LACHES.

The delay of beneficiaries of a trust in filing a bill against the executor of their trustee after the executor had refused to recognize the trust, and until part at least of the assets of the estate, including the trust fund, had been distributed and more than six years had elapsed from the repudiation of the trust, though it bars the beneficiaries' right to hold the executor liable individually, does not bar their right to an accounting by the executor as trustee, since laches is an equitable defense, not imposing a hard and fast limit like the statute of limitations, and one element of its application is that there must be inequity in the proceeding.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 421–426; Dec. Dig. ⬅305.]

5. EXECUTORS AND ADMINISTRATORS ⬅315(6)—DISTRIBUTION—DECREE—CON-CLUSIVENESS.

The beneficiaries of a trust may, after the death of their trustee and the repudiation of the trust by the executor of the trustee, file their claim as a money demand against the estate; but they are not required to do so, and if they choose to file a bill for an accounting, their right thereto is not barred by a decree of the orphans' court directing a sale of the trust property and a distribution of the proceeds, though such decree limits the right of the beneficiaries to enforce the decree obtained in the accounting suit, so as to allow enforcement only against property belonging to the trustee's estate which may not have been already distributed.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. § 1309; Dec. Dig. ⬅315(6).]

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

6. TRUSTS ☞305—REMEDIES OF BENEFICIARIES—ACCOUNTING—DISPOSAL OF TRUST PROPERTY.

The fact that a trustee has parted with possession of the res does not alone relieve him of his liability to a bill in equity for an accounting and compel the beneficiaries to resort to an action in assumpsit.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 421–426; Dec. Dig. ☞305.]

7. TRUSTS ☞294—ACCOUNTING—EXECUTORS OF TRUSTEE—LIABILITY.

The executor of a trustee, who had refused to recognize the existence of the trust and had distributed the trust property among the residuary legatees under the decree of the orphans' court, is not liable to the same extent as would be a trustee who converted the trust funds to his own use, but is liable only for what he had received, with its accretions, since he was justified in requiring, in the interest of the estate he represented, that the beneficiaries establish the trust.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 412; Dec. Dig. ☞294.]

8. ESTOPPEL ☞68(2)—INCONSISTENT POSITION—PLEADING.

Beneficiaries, who seek an accounting from the executor of the trustee and avoid the charge of laches by contending that the trust was not repudiated by the trustee in his lifetime, cannot on the accounting ask to have the executor of the trustee charged with amounts for which he would be liable only in case the trustee had converted the trust funds to his own use.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 166, 169; Dec. Dig. ☞68(2).]

9. TRUSTS ☞305—ACCOUNTING—DEBTS OF BENEFICIARIES.

In a suit for accounting by the beneficiaries of a trust against the executor of their trustee, where some of the beneficiaries were individually indebted to the trustee's estate, such indebtedness does not affect the balance of the fund found due on the accounting, since such claims are not within the principles of set-off; but the indebted beneficiaries will be required to do equity by paying those debts before they receive their share under the accounting.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 421–426; Dec. Dig. ☞305.]

In Equity. Suit by John S. Alexander and others against the Fidelity Trust Company and others. Decree for complainants.

See, also, 214 Fed. 495; 215 Fed. 791.

Frank A. Harrigan, of Philadelphia, Pa., and Henry A. Wise, of New York City, for plaintiffs.

H. Gordon McCouch, of Philadelphia, Pa., for defendants.

DICKINSON, District Judge. The disposition of this case may well take the form of a discussion of the general merits of the complaint, a finding of facts in response to the requests made, and a statement of the conclusions reached. Whatever may be thought of the grounds of complaint as shown by the pleadings, those on which the case was tried and defended, and the case and defense as finally presented, may be stated as follows:

The family relations of the Alexander family were of a characteristic, and in the old days not an unusual, type. The type is not so common in these days. The transactions between the original parties

cannot be fully understood, unless this feature is kept in mind. In the light of it we get a sufficiently clear view of what was done, and why it was done, and done as it was done. There was no thought of a resort to the machinery of the law, and no thought of the possibility of a necessity to resort to it. The only tribunal to which the parties looked or thought of was the family council. Moneys had come through the payment of an insurance policy on the life of a son and brother. The legal title and right to these moneys passed under the intestate laws to the father as the surviving parent. The family council decreed that the moneys should be invested in the stock of the Corn Exchange National Bank, with which the father was connected, and that the 60 shares which figure in this litigation should be held by the father in trust for the sister and brothers of the intestate. This family council had its own forms of procedure, and adopted those of the law in effectuating the purpose above stated, by having the legal title to the stock put in the name of the father as trustee, with an entry on the books of the father which was in effect a declaration of trust in favor of the beneficiaries, and thereafter for about 20 years this ownership was recognized and followed in the distribution of the dividends. One of the beneficiaries had died, and the others were assumed as a matter of course to have succeeded to his share, and the father declared that he so held. The father, being a man of means, was regarded by the children and evidently by himself as the family purse, upon which the children, some of them rather heavily, and all of them perhaps to some extent, drew at will. The father had occasion to borrow money, and he, as he evidently felt, as the father of the family, he was at liberty to do, or because his personal responsibility was adequate protection, pledged this stock (among other shares) as collateral for loans. It may be that he also thought the children were not taking as good care of their dividends as he could take for them. At all events, whatever the occasion for it, another council was called, at which it was resolved that the father should retain the dividends and hold them, as well as the stock itself, for his children against the coming of a possible rainy day. The children all acquiesced in this. Doubtless they did it without reluctance, in filial deference to the declared wish and judgment of the father. The then situation justified them in the expectation that the property rights of all members of the family would adjust themselves, and no question over the trust arise.

A radical change in the attitude (real or made to appear) of the father with respect to this trust came about. As the evidence was presented, this change appears with startling suddenness. The father had reached the advanced age of nearly 90 years, when a deed of trust was made by which he surrendered control of his estate, and by which the trust was in effect repudiated. This deed was made to the Fidelity Trust Company. Doubtless for the reason that the Trust Company did not feel at liberty to disclose the business of those who dealt with it, or to go counter to their directions, the deed was not recorded, nor was its existence disclosed until July, 1912, years after the death of the father. Whether such was the intention, the result

had all the effect and answered all the purposes of a concealment. This deed of trust was followed by a will of like import in repudiating, or at least ignoring, the trust. Knowledge of the existence of this latter paper provoked a caveat, followed by a devisavit vel non contest, and direct notice to the Trust Company of the trust ownership of the stock. The will contest was determined adversely to the contestants. As soon as it was determined a bill was filed raising the claim of right now set up.

The Fidelity Trust Company, as executor, filed an inventory of the estate of John Alexander, deceased, thereby acknowledging to be in its hands as executor 319 shares of said bank stock, including the 60 shares in dispute. They filed a first account, showing this same stock to be included in the balance of the estate remaining in their hands. Of this stock 200 shares were sold at auction to enable the accountant to comply with the decree of distribution then made, and the remaining 119 shares were transferred in accordance with the same decree to Lucien H. Alexander. The second account, filed by the executor, and confirmed by the orphans' court, included items of charge and discharge for the moneys received for the stock thus sold and the stock sold and distributed.

Lucien H. Alexander is a party to this bill and was duly served. He has interposed no defense. No obligation or duty rests upon him, however, except such as arises (if any) out of his receipt of stock. Whether the specific stock represented by certificate No. 562, which belonged to plaintiffs, was transferred to him, or was part of the 200 shares sold, we have not been asked to find, and the fact does not appear—at least we have not been able to find any trace of it. The complainants ask (among other requests) that two facts be found: One, that John Alexander held this stock in trust for the complainants; and the other, that in May, 1877, a further trust relation was created, under which he was to keep the dividends, holding them upon a like trust. They further ask for a finding that the estate of John Alexander account for this stock and these dividends.

The first fact is found from the evidence of admissions made by John Alexander. The second fact is found, and can be found, only from the testimony of John S. Alexander. The defense urged is that all right of action, which might otherwise be in the complainants, has been lost through their laches; that John S. Alexander was incompetent to testify, and because of this there is no evidence from which a trust to hold the dividends can be found; that there is no evidence of any trust relation between the complainants and the other defendants as individuals; and that the executor is protected by the decrees of the orphans' court distributing its decedent's estate.

The question of the competency of John S. Alexander as a witness was raised at the threshold of the trial, and may be first considered. It is well, perhaps, to interpolate here, in order that the notes of testimony may be intelligible, that the defendants at first did not deny the competency of the witness under the Pennsylvania statute, but denied that competency was to be determined under the law of Pennsylvania. They afterwards conceded that the Pennsylvania law was

controlling, but denied the competency under that law. As there was no doubt upon the one point, but much doubt upon the other, the testimony was admitted, subject to the objection, and with leave to move to strike out the testimony. This motion was made, and the question of competency squarely raised. It is, of course, clear that we are bound by the Pennsylvania law. R. S. § 858, as amended by Act June 29, 1906, c. 3608, 34 Stat. 618 (Comp. St. 1913, § 1464).

[1] The law of Pennsylvania is in turn declared by the act of 1887. This act worked a complete bouleversement in the law. Before that act incompetency at common law continued until removed by statute. After the act every witness is competent unless within the excepted classes. The pertinent provision is that of section 6, which provides that an interested witness may become competent by a bona fide "release or extinguishment" of his interest. This condition is found to have been complied with so far as an assignment of his interest is a compliance. We find that he in good faith assigned all his interest to his brother. The question is, therefore, whether an assignment is within the meaning of the act. It would have been expected that this question would have been settled. The industry of counsel have not, however, brought to light any rulings which would justify (otherwise than inferentially) the statement that the law on the subject has been set at rest. The best which can be done is to rule it by a survey of the act, and to follow what seems to be the trend of the more authoritative rulings. It is well to have in mind clause "e" of section 5, to which section 6 relates. This provides for defendants in actions of ejectment who disclaim title. One of its purposes may have been to guard against a plaintiff making an important witness a defendant in order to get rid of him as a witness. The words "release or extinguishment" suggest the ending of a claim rather than its transfer. The word "assignment" presupposes the continued existence of the claim assigned. Nevertheless, the word "release" is also a word of conveyance, and when the grantee already has title or an interest in the subject-matter, it is not only an appropriate, but the accurately appropriate, word of designation of the conveyance made to him. In formal legal documents, we have the word "release" coupled with "quitclaim," and also with "enfeoff," "grant," "convey," and the like. "Assignment," however, and words of like meaning, are in very common use as expressing the idea of transfer only, and if the Legislature had the thought in mind, it suggests the inquiry why was not the word used. The aid which is afforded us by the adjudged cases is illustrated by the following among many others: Heft v. Ogle, 127 Pa. 244, 18 Atl. 19, 14 Am. St. Rep. 839; Turner v. Warren, 160 Pa. 343, 28 Atl. 781; Semple v. Callery, 184 Pa. 95, 39 Atl. 6; Cobb v. Cobb, 4 Pa. Super. Ct. 273; Cameron v. Gray, 202 Pa. 566, 52 Atl. 132; Darragh v. Stevenson, 183 Pa. 397, 39 Atl. 37; Morgan v. Lehigh, 215 Pa. 443, 64 Atl. 633; Matthews v. Matthews, 11 Pa. Super. Ct. 381.

We have not space for an analysis of these cases. Some of them would be cited for and others against competency. Some of them would be cited in support of either view. The reason for this is that

the ruling was upon some special feature not here present, and the bearing upon another point not ruled is a matter of implication or inference. Darragh v. Stevenson, for instance (and we single this out because, with Matthews v. Matthews, it is relied upon by defendants), ruled that an assignment not made in good faith would not qualify the witness. The distinction between a transfer and an extinguishment was pointed out and stated with clearness and force. This feature of good faith was referred to, however, and it was suggested that an extinguishment could scarcely be otherwise than in good faith, and that the Legislature might well be thought to have included transfers in the word "release." The court leaves this point, however, undecided and rules the question on the absence of good faith.

Words and Phrases, 2621, made a large and unwarranted draft on this case in stating it to have flatly ruled that an assignment was not within the act. The logical result might be as well argued as otherwise than incompetence. The case was ruled by finding ·bad faith. Why find bad faith, if no assignment would qualify? Matthews v. Matthews followed ·the Darragh Case, but quotes only one of the two thoughts expressed by· Justice Mitchell in that case, and also finds bad faith.

On the other hand, in Semple v. Callery there was the precise point we have before us, and the witness was held competent, and the judgment affirmed by the Supreme Court. The ruling, however, is no ruling of the point, because it was there conceded that the assignment qualified the witness, if made in good faith. There was no objection to the witness, the objection was to the trial judge finding the fact of good faith, and a point was presented asking that this question be submitted to the jury. This was refused, and the refusal assigned for error. The assignment was overruled, but no view is expressed upon the other point. Any one of at least these inferences may be drawn from this silence.

In Heft v. Ogle, the witness was held competent. This case was heard on appeal in 1889. It may be the trial was before the act of 1887, although this does not appear. At all events, no reference is made to the act of 1887, beyond a general reference to legislation showing the trend of policy to be toward admitting evidence. The case may be said to have turned on the fact of interest.

Turner v. Warren, however, and Cobb v. Cobb (in each of which the witness was admitted), can be distinguished from the present case only in the fact that the first was an action of ejectment, and the grant a deed merely in defendant's chain of title, and in the Cobb Case the assignment was in form and in legal effect a release. It was, however, to all practical purposes an assignment. The assignee was both a part owner and the holder of the legal title as administrator. As administrator she received, and, as the release relieved her from accounting, she had the right to retain, what the witness had relinquished. We by no means think the question free from doubt, but on the whole we are of opinion that the act does not disqualify, and that the weight of authority favors this conclusion. Because of

the doubt, however, we have separated the findings into those made with and those made without the testimony of this witness. Different conclusions of law follow these different fact findings.

[2] Another defense interposed is the protection afforded by the decrees of the orphans' court. Here there is in the argument an apparent (although doubtless only seeming) confusion of thought. The orphans' court had undoubted authority to take into its hands the custody (through its control over the executor), the administration, and the distribution of the decedent's estate of the father. When it thus assumed jurisdiction, no other court could be induced to attempt to interfere. The decrees of the orphans' court in the exercise of this jurisdiction are conclusive upon all parties and the rem. The jurisdiction of that court, however, was only over the estate of the decedent. It was without jurisdiction, and, of course, did not attempt, to pass upon conflicting claims of title to property, where one of the titles set up was adverse to the estate. It could entertain, if submitted to it, claims of indebtedness against the estate.

The presentation of two supposititious cases analogous to the present will make this distinction clear. A man has possession of property claimed to belong to another, or claims the ownership of property in possession of another. The man dies, and his estate is to be administered and distributed. Neither of these claims could be passed upon by the orphans' court, but must be determined by the common pleas through an appropriate action, to which the legal representative of the decedent would be a party defendant or plaintiff. That is one case. The other case is that of a claim made against the estate. It might arise as a simple claim of debt, or it might be such as that the claimant might elect to treat it as a claim on an implied assumpsit. The orphans' court could pass upon such a claim if presented, or the claimant would have the right to bring his action of debt in the one case and recover judgment, or in the other, refusing to treat the decedent as a debtor, file a bill for an accounting and secure a decree. Having established his rights as against the estate, the orphans' court would then mold its decree of distribution accordingly. This judgment or decree would bind the estate and those claiming under it, and (subject to the res inter alios acta principle) would be conclusive.

If the claimant in the second supposed case elected to present his claim in the first instance at the audit as a claim of debt, the finding of the orphans' court thereon would be conclusive, and he could not have the claim again adjudicated elsewhere. Whatever decree of distribution was made by the orphans' court, after or before he obtained an adjudication of his rights in another court, would be as conclusive however as any decree affecting the rem. The claimant's protection against the possibility of the rem being awarded to some one else, before or after he had successfully asserted his rights, would be through and by a resort to the orphans' court. There is in none of these instances a conflict of jurisdiction.

In the application of the legal principles suggested to the facts of this case, we should have in mind that the Fidelity Trust Company appears in a dual character. It is an individual, and as such is acting as

executor. As executor, it has assumed certain duties and liabilities which bind it as an individual. It is also a representative character as executor, and as such it is merely a legal name for the estate. As an individual acting as executor, it is fully protected by the decrees of the orphans' court, and not answerable to any one for the disposition it made of the assets of the estate in obedience to those decrees. Any action may, however, be brought against the estate, and it, as executor, is properly named as defendant. It is also answerable in an action for anything it may have done, and it may be answerable, although what it did it assumed to do as executor.

There is nothing in evidence which would justify a finding that the trust company did anything in violation of the rights of these plaintiffs. So far, therefore, as this feature of the defense affects the proper ruling to be made, the defense is made out. What it did or omitted doing has some bearing, however, upon the next branch of the defense which affects, not it, but the estate of which it is the representative.

[3] This ground of defense is that of laches. Statutes of limitation and the equitable doctrine of laches have in principle the same policy of the law as a basis. Each recognizes that, both for the public good and in justice to private individuals, litigation over stale claims and long-forgotten transactions should be discouraged. While each has the same end in view, law and equity promote and accomplish this end by and through radically different means. The legal method is by a fixed and rigid rule, which is to be applied to all actions, and forbids the just along with the unjust. Equity inquires into the fact, and discriminates, forbidding only those proceedings, the pressing of which would in itself involve injustice, and permitting those which to forbid would work injustice. The general principle, however, remains and this good end is kept in view, and stale claims are rejected, unless both the justice of the claim and a reason (more than an excuse) for the delay in presenting it appears. Moreover, the equitable principle that the decree of a chancellor is always of grace, and never a right of the complainant, is applied, and a decree supporting a stale claim is always refused, unless its justice, not only appears by the evidence then obtainable, but unless the chancellor is further persuaded that its justice would have appeared, had the transaction been freshly presented.

This claim, if we consider only the flight of time, is stale to the point of rankness. Without the testimony of John S. Alexander, we could only know that the father (as shown by his own writings) had nearly 50 years ago declared a trust for his children, which he had recognized up to 1877, and which had, as he at least claimed, ended, and of which from then up to the time of his death (a period of almost 20 years) we hear not a word. We speak of the ending of the trust relation, because the books by which the trust was proven contain the statement "All settled." We would not be concerned with the question of whether a trustee could thus by self-serving entries make evidence for himself, because all the entries were put in evidence. From this evidence a chancellor might find a trust to have existed, and might not feel disposed to find as a fact that it had ended; but he could not deny the conviction that to charge the decedent with a continuing trust on this evi-

238 F.—60

dence would be so fraught with at least danger of injustice that he must refuse a decree for an accounting.

The evidence, however, with the testimony of John S. Alexander, changes its whole aspect. If the facts are narrated in sincerity and truth (and of this we are fully persuaded), the whole situation is made entirely clear, for to all intents and purposes the father himself was speaking to us in the person of this witness. The witness knew all about the transactions as fully as the father did. It may without exaggeration in real fact be said that he knew the father's inmost thoughts and purposes. It is made probable, if not certain, that the entries in denial of the existence of the trust were not made until the deed of trust was executed by the father, or were made in preparation for the deed and will. This fact, or, indeed, a well-grounded suspicion of it, in the absence of any evidence of the entries having been sooner made, destroys all their evidentiary value, for this deed and what followed it bear in themselves evidence of the impress of a will other than that of the father. By the deed he surrendered all control over his property. This may have been (and we have nothing before us to justify the finding that it was not) justified. The only justification for it, however, would take away all significance from what he did as a denial of the trust, or a repudiation of it. The continuance of the trust, therefore, down to the time of the father's death, with the retention of the dividends, is not only not inconsistent, but was in pursuance of the trust and its purposes.

Nor do we think anything which has since occurred bars the action of the plaintiffs. We have already found the Trust Company to have done nothing in violation of the rights of the plaintiffs. At the same time it cannot be denied that the company laid full emphasis upon the fact that it was the representative of those who took under the will through the deed of trust, and was responsible to them alone, and repudiated the view of the plaintiffs that it was a disinterested and unpartisan custodian of the property. The bottom and underlying facts and the personalities of the parties doubtless made the proper rôle of the company a difficult one, and we are making no finding of criticism of it in what it did, or omitted doing. At the same time the unresponsive, noncommittal, and (from the plaintiff's point of view) the almost sphinxlike attitude which the Trust Company throughout felt obliged to assume has a bearing upon what the plaintiffs were bound to do to preserve their rights. In one sense it operates against the plaintiffs, because this attitude of hostility in fact and effect, however impartial and fair, or indeed benevolent, in motive and purpose, put the plaintiffs upon their mettle and called upon them to assert their rights. On the other hand, this sphinxlike reticence threw obstacles in the way of the plaintiffs in getting such a grasp of the situation as would make clear what they were bound to do, and obscured the path they ought to follow. One result is that the present case fairly bristles with more or less technical difficulties; but we do not think its substantial merits open to much doubt.

We append specific answers to the findings of fact and conclusions

of law requested in the points submitted, and the general conclusions reached. These are as follows:

(1) John Alexander, the father, held 60 shares of this bank stock, represented by certificate 562 (and the dividends received by him), for his children, who were the real owners thereof, and his estate was liable to the real owners for this property, and should have accounted therefor.

(2) The plaintiffs had a good cause of action to enforce this accounting, and this liability, if this right has not been lost through laches or otherwise.

(3) The plaintiffs have no cause of action against the Corn Exchange National Bank.

(4) The plaintiffs have no cause of action against the Fidelity Trust Company, otherwise than as representing its decedent's estate.

(5) The plaintiffs have no cause of action against Lucien H. Alexander; it not appearing that he received the 60 shares of stock represented by certificate 562.

(6) Without the testimony of John S. Alexander, plaintiffs have not established a cause of action, and are guilty of laches, and the bill should be dismissed.

(7) With the testimony of John S. Alexander, the trust is established, both for the stock and the dividends, and the plaintiffs have purged themselves of the charge of laches.

(8) The plaintiffs are entitled to a decree against the estate of John Alexander, deceased, and against the Fidelity Trust Company, executor, etc., of said decedent, for an accounting for said 60 shares of stock and dividends, with all record costs, and costs as stated below.

(9) The Corn Exchange National Bank is entitled to recover its costs.

(10) The plaintiffs are entitled to recover their costs.

The requests are answered as follows: Plaintiffs' fact findings 1 to 12 (both inclusive) are found as requested upon the testimony of John S. Alexander. Without this testimony, requests 2, 3, 4, and 5 are denied, as not established by the evidence. Requests 1 and 2 for conclusions of law are granted. Request 3 is refused as stated.

Defendants' requests for findings of fact are granted as to all except 2, 3, 5, 12, and 14. Findings 2 and 3 are not found, because of no value to us. Requests 2 and 3 are not found, because the evidence contains no reference to the fact referred to in 2, and 3 is a ruling in the Jones trust estate, which is controlling as an authoritative ruling to be cited, and not a fact to be proven. The ruling in that case, moreover, has no bearing upon the case under consideration. The ruling in the Jones case was that the court would decline to appoint a successor to a trustee where the trust had terminated. The question in the present case is whether a trustee is relieved from his liability to account merely because there were no further duties for him to perform as trustee. Finding 5 is denied as a too rhetorical statement. It is found that Archibald A. Alexander and John S. Alexander received moneys from their father and were indebted to him, and made no demand for the stock or dividends. Request 14 is

granted as to $3,500. There is no evidence upon which to find re-
·quest 12.

Legal Conclusions.—First is denied. Second is also denied as
written. The complainants were not bound to present their claim of
title to the 60 shares of stock at the audit of the estate of John Alex-
ander, nor to present a money claim as for a conversion, nor was the
audit a finding upon the ownership of the 60 shares of stock. The
·orphans' court was without jurisdiction in that proceeding to deter-
mine any title to the stock as property adverse to the estate, and the
claim of title by the complainants could not have been entertained,
if made. The complainants might have elected to treat the reten-
tion of the stock as a conversion, and made a money demand, instead
of a claim of title; but they were not bound to do so because the
executor required it of them. The decree of distribution following
the audit protects the executor in obeying it, but does not prevent
the plaintiffs from asserting their rights otherwise as against the
·estate. The third request is refused. The fourth request is refused.
The fifth request relates to any accounting which may be made, and
will be considered when the form of the decree to be entered is set-
·tled.

A decree may be submitted embodying the findings made.

## Opinion sur Trial Hearing upon Accounting.

It has already been determined that the plaintiffs are entitled to an
·accounting, by the executor of John Alexander, deceased, for the
moneys and property in the hands of said decedent, at the time of his
decease, held by him in trust for the plaintiffs. Inasmuch as no ex-
ceptional conditions existed justifying a reference to a master under
equity rule 59 (198 Fed. xxxv, 115 C. C. A. xxxv) the accounting was
held before the court. When such accounting is made, the plaintiffs
are entitled to such form of decree prescribed in rules 7, 8 and 9
(198 Fed. xx, xxi, 115 C. C. A. xx, xxi) as may be appropriate. The
facts of this case and the condition of the record are such as to
make a money decree the proper one. The parties did not in form
follow the procedure indicated by rule 63 (198 Fed. xxxvii, 115 C. C.
A. xxxvii). The substantial situation, however, is that the plaintiffs
are seeking to surcharge the estate to the amount of the sum claimed
to belong to the plaintiffs. This result is sought to be reached through
·evidence of the value of the bank stock and the aggregate amount of
the dividends thereon held by the decedent as trustee for the plaintiffs.
The shares of stock having been parted with by the sale of some and
the transfer of the remainder in the administration and distribution
of the estate of the decedent, the accounting must from force of ne-
·cessity be for the amount of the dividends and the sale or other value
·of the stock. The task before us might in consequence be confined (as
in effect it is) to finding the principle which is the basis of the liability
·of the accountant, in order to determine the measure and extent of
such liability and to a statement of the account on this basis. We
anticipate the conclusion reached by finding that the estate must ac-
\·count for the dividends and the value of the stock, the benefit of which

the estate actually received. This sum is found to be $8,205. If the principle of liability be as found and the figures are correct, plaintiffs are entitled to a money decree for the payment of this sum. Any further discussion of the questions involved in the consideration of this cause would ordinarily be confined to the two points suggested, or the findings left to vindicate themselves. The discussion of them has, however, unavoidably drawn the findings already made into the argument. Moreover, counsel seem to have interpreted these former rulings in a sense different from that intended, and, as we still think, expressed in the opinion filed. We hold such measure of respect for the views of counsel that we would not wish the former ruling to be misunderstood or misinterpreted. We will therefore, so far as they bear upon the accounting features of the case, restate the findings made. This will draw out the opinion to perhaps an undue length, but we hope it will avoid any misunderstanding of what is ruled.

There is just here a phase of the original case which counsel seem to have overlooked, and, because of this, have missed the bearing point of some of the expressions in our former opinion. The bill as filed combined a demand for an accounting on behalf of, or, as we may for greater clarity express it, by, the decedent as trustee, with complaints against and demands for decrees against individuals, including the executor. To instance the latter alone, there were complaints and demands for decrees against the executor, both in its representative capacity and as an individual. This differentiation is so obvious that we did not think it necessary to make it prominent, assuming the general expressions used would be applied with this distinction in mind. As the bill has been dismissed so far as affects the individual defendants, we are no longer concerned with this feature. We do wish to refer to it, however, and to repeat and emphasize the findings made, because counsel for defendant has construed the opinion as visiting some condemnation upon the executor. Nothing could be more foreign to the thought in mind. The expressions frankly characterized by counsel for defendant as to him "vague and mystifying" had no such reference as ascribed to them. They had an entirely different use and bearing. To what these and other criticized expressions referred will be discussed later in connection with the other phases of the case. We mention them now to bring into relief the findings which were and are made. The executor did no wrong to the plaintiffs or to any one. It was clearly within its rights in refusing to recognize the trust or to admit the claimed title of the plaintiffs. It was more than right in calling upon the plaintiffs to establish their title. This involved good advice, which, if it had been accepted and acted upon by the plaintiffs, would have saved all of us the trouble and the plaintiffs the risks of the decision of questions which have grown out of their failure to sooner move. The executor was fully justified in proceeding, as it did, to administer and to have distributed the estate in its hands. This court did not and does not give to what was done the legal effect which the executor ascribes to it, but this is far from imputing blame to it for either what was done or the legal consequences of what was done. Counsel seem to have confused the defense based upon the legal effect of the proceedings in the orphans'

court with the defense of laches. There is a mingling of the two because the facts upon which is based the one are included in the facts upon which is based the other. Nevertheless they are wholly different and distinct. This will appear if laches is (arguendo) eliminated. We would have ·then this clearest case and proposition of law:

John Alexander, at the time of his death, had these 60 shares of bank stock and the dividends paid thereon, of all of which the executor took possession as part of the assets of his estate. The fact was that they were no part of his estate, but were held by him under a trust .which was recognized and admitted by him up to the time of his decease. On demand made for the stock, the executor (as in fact it did and was justified in doing) took this position. The· stock may not belong to the estate, but be, as claimed, trust stock. We, however, cannot admit this, or part with the stock, until you have established the trust. The plaintiffs thereupon filed a bill in equity against the estate, represented by the executor, for an accounting. The latter proceedings were delayed, and, in the meantime, part of the assets of the estate (including this stock) was administered and a partial distribution made through a decree of the orphans' court. The question would then arise: "Is this decree of the orphans' court a bar to a decree by the court·in equity for an accounting?" That presents the one defense. Then add to the facts already stated the further fact that the plaintiffs delayed the filing of their bill, and we have the other question: "Have the plaintiffs been guilty of laches?" This separation of the defenses enables us to appraise each at its real value.

This long prelude brings us to a consideration of the defenses raised. There is some difficulty in formulating them, because they, to some extent, overlap, and some, or parts of some, are embraced in others. They may, however, be stated as follows, and repetition be avoided in the discussion by discussing them, when necessary, together·:

1. The decree of the orphans' ·court, disposing of and distributing this stock, is a bar to the present proceedings, because such decree necessarily involved a finding that the stock belonged to decedent and was part of the assets of his estate, and thereby further finding that it was not the subject of any trust. in favor of the plaintiffs who are further concluded by it.

2. The executor having brought this stock into the orphans' court to have its disposition determined, that court acquired jurisdiction of the res, and when it adjudged the res to be the property of the decedent, and thus ex vi termini ́not trust property, such adjudication (unless reversed) was final and conclusive upon the res and every one, and the question of any interest of the plaintiffs therein became res adjudicata.

3. The same defense above stated is reurged with the added thoughts (1) that the plaintiffs notified the executor that they would,·but failed to present their claim to the orphans' court; and (2) the executor notified and warned them so to do, and when they did not, and the accounts of the executor had been audited, again notified and warned them to apply to the orphans' court to have the decree opened.

4. The facts on which the above defense is based are also included in the defense of laches, which we will separately state.

5. The claim of the plaintiffs, from and after the time when the stock passed out of the possession of the executor, was one of creditors only, and their only remedy an action at law.

6. It may not now be urged as a defense, but it had been urged upon us, and is included now, to make the statement of defenses complete, that when the executor refused to recognize the trust, the claim of the plaintiffs was that of creditors only, and their sole remedy to present it as a claim (either with or without having first reduced it to judgment) at the audit of the estate, and, having failed to do so, they are concluded by the decree following the audit, and without other remedy.

7. As the executor, neither in its representative capacity nor as an individual, has now possession of the res, it cannot be called upon to account as the representative of the deceased trustee. We do not understand the principle on which this defense is based to be pushed to the extreme limit that no trustee who has parted with the res, corpus, or subject-matter of the trust can be called upon to account, but is liable only to an action at law. We do understand, however, that under the facts of this case the proposition is that the executor of a deceased trustee, when he (the executor) has parted with the res, cannot be called upon to account on behalf of the deceased trustee.

8. Any action at law by the plaintiffs would be barred by the statute of limitations, and these proceedings are because of this likewise barred.

9. The plaintiffs have been guilty of laches.

We will, for the reason that, as before stated, the findings of the court have been apparently misunderstood by counsel, restate our findings, and will first take up the above defenses seriatim, but bunching some of them, and follow this with the consideration of the accounting features of the case, which now really alone concern us.

To make the restatement complete in itself, we will premise certain fact findings, and in doing so dispose of the defense of laches. When this cause was first presented to us, it was based upon the simple averment that the decedent held 60 shares of the stock of the Corn Exchange National Bank, the certificate of which was in his own name; but the stock was further averred to have been held in trust for the plaintiffs. The trust was admitted to be, not merely moribund, but to have been actually dead for 35 years or more before the filing of the bill. On the face of this showing we were asked to decree that this stock (which in the meantime had passed into other hands, or which, at least, did not appear to be still among the assets of the estate of the deceased trustee) was the property of the plaintiffs, and that (among other prayers) the Corn Exchange National Bank be required to account for and pay over to the plaintiffs all dividends which had been declared and paid by the bank during all these years, although it further appeared that the bank had paid the dividends to the one in whose name the stock stood, and without notice or intimation even of the claim of the plaintiffs. The court, sitting as a court of equity, refused,

of course, to entertain such a bill, and dismissed it on the ground (among others) of laches appearing on its face. It was to this bill that the phrase which is now recalled and quoted by counsel for defendant, that "the claim was stale almost to rankness," applied.

The present bill, however, put an entirely different phase on the transaction, and the evidence fully supported the main averments and prayers of the bill. We say the main prayers, because the draughtsman of the bill, as in such cases there is always a temptation to do, overshot the mark and asked (as the plaintiffs now ask) for more than that to which they are entitled. The main facts, however, were established by evidence and testimony which stamped the essential averments as not merely substantially, but literally, true. No one who was present to observe the course of the trial and the witnesses and their demeanor could doubt the true state of the facts. Indeed, there was no denial of them, or suggestion of denial. The defense contented itself with a test of the ability of plaintiffs to prove the facts. The facts themselves are not in dispute. It may be they were not established by legal evidence, because some of them appear by the testimony of a witness whose competency is in dispute, and is at least or best doubtful. This question has been fully discussed, and so far as this court is concerned has been disposed of.

These facts were that certain moneys came to this family from what may be called a family source. They were the insurance moneys on the life of a deceased brother of plaintiffs. The moneys were brought before a family council, which decided to invest them in stock of the Corn Exchange National Bank. They were put, it is true, in the name of the decedent. He owned other shares in the same bank, and these shares were put in his name, not as an individual, but as "trustee." It is again true that the certificates were afterwards changed, so as to be in the name of the decedent; but it also appeared that he at the time and at other times pledged them as collateral, and the inference is justified that this was the occasion for the change. He, however, definitely and positively, in his own handwriting and by his own books, admitted and recognized the trust and earmarked one of the certificates as representing the trust shares. He further recognized and admitted it by regularly and for years paying over the dividends to the plaintiffs.

[4] A number of years before his death a new trust relation was established and admitted and declared by him. This was that he would thereafter retain and hold in trust for the plaintiffs the dividends paid on the trust stock. Right here is, as it seems to the court, the crux of the whole case, both in respect to its real merits and the more technical question of the right of the plaintiffs to maintain this bill. With the testimony of John S. Alexander, part of the evidence in the cause, the equities of the plaintiff fully appear. Without this testimony, they have shown none. The trial judge, as before stated, entertains no doubt of the truth of the testimony, nor is any doubt thrown upon it directly by word or intimation. The competency of the witness is by no means clear. The fact, however, is that the decedent up to a short time before his death acknowledged and admitted the trust, and died without either himself or any one for him having intimated any

·change of. attitude towards it. The retention of the stock and the dividends was consistent with the trust and required to fulfill its purposes. The plaintiffs acquiesced in this retention and never demanded or asked for their dividends in the lifetime of the father. We have, therefore, this simple proposition: A man occupying a trust relation to others, and as such trustee having money and other property constituting the trust estate in his hands, and held by him upon an existing acknowledged trust dies in possession of the trust property. Assuming the cestuis que trustent could assert their right to that which belonged to them either by an action at law or through a bill in equity for an accounting (a question which will be next discussed), and also that the trust has existed and nothing been paid thereunder for a length of time exceeding the six years' bar of a statute of limitations; would the action or the bill be barred by the statute or by laches? It would seem to be clear that there was no time which could be found from which the statute would begin to run. Assuming, further, that the trustee had died, holding personal property under such a trust, and the executor, after his appointment, notified the cestuis que trustent that he could not recognize the trust, and that they must establish it by presenting their claim to the orphans' court, or by bringing an action at law, or filing a bill in equity, and they delayed the filing of the bill beyond the six years' limit; would their right to an accounting be barred by the statute or laches?

The legal maxims and phrases in common speech, as that "equity follows the law," and that "equity, although not bound by statutes of limitation, will follow and apply them in principle," and others of like import, are misleading unless the distinctions made are observed. One distinction between the defense of the statute at law and that of laches in equity has been already indicated in the former opinion. Laches as a doctrine is not an unyielding, arbitrary time limit obstacle to the proceeding, but is an equitable doctrine out of which a defense arises. It must have in it the element that there is an inequity in the proceeding. Where a trustee holds upon a direct and admitted trust, to hold that it could not be enforced merely because it had existed for years would be unthinkable. The ruling that an unrecognized and before unheard of trust could be unearthed by digging into a prehistoric mound would equally affront our sense of right. Hence we have the doctrine that statutes of limitations are no bar to the enforcement of an existing trust, and the other doctrine that the defense of laches can be successfully interposed to the attempt to establish a trust which is averred to have been created in the forgotten past.

The path blazed by judicial rulings by the courts of law and by chancellors is by no means a straight and undeviating one. It is nevertheless sufficiently well defined to supply a guide to our destination. The attempt to discuss them would be an interminable task. McClintock's Appeal, 29 Pa. 360, for instance, lays down, in the clear and vigorous language characteristic of the great judge who delivered the opinion in that case, that an executor could not invoke the bar of such statutes against the claim of a creditor whose claim was not barred at the time of the death of the decedent. This was followed for many years, until the principle on which it was based was modified

by the ruling in York's Appeal, 110 Pa. 69, 1 Atl. 162, 2 Atl. 65. How far the distinction which was at one time recognized that the statute would not bar one whose remedy was exclusively in equity, but would bar one who could proceed either in equity or at law, need not be discussed. Johnstone v. Humphreys, 14 Serg. & R. (Pa.) 394; Lyon v. Marclay, 1 Watts (Pa.) 271; Seybert v. Robinson, 2 Pa. Dist. Ct. R. 403.

The case of Zacharias v. Zacharias, 23 Pa. 452, affords us an illustration of the distinction with which we are now concerned. The principle to be drawn is that a mantle of protection will be made out of statutes of limitation or out of the doctrine of laches, to be thrown about the person of any party who in the given case is found to be entitled to such protection. This distinction is of all importance·in the present case, both in the consideration of that phase of the defense now being discussed and that discussed later. Its present and application springs out of the fact that the executor warned the plaintiffs to have their rights established, and that it would proceed to make distribution of the assets in its hands. A belated proceeding, which would affect the executor in what it had done, would not be permitted. We are confining ourselves now to the defense of laches, and not considering the other feature of the protection afforded by the decree of distribution as such. This bill, therefore, so far as it sought or seemed to seek a remedy against the executor or other individuals, was dismissed. The plaintiffs have shown no equities against them. This, however, is a far cry from the other proposition that the plaintiffs are not entitled to any accounting by their trustee, and a finding of what would result from such an accounting. It may be that the remedy left to them has lost all practical value, but that is an entirely different feature, which will be adverted to later.

The point ruled is that plaintiffs are entitled to an accounting as their right. This is an already overlong discussion of the defenses enumerated as 4, 7, 8, and 9, except in so far as the proceedings in the orphans' court also enter into this branch of the defense. Of the effect of such proceedings later. There is, of course, the more technical position, which might be taken, of want of jurisdiction in equity based upon the assertion of an adequate remedy at law. No such defense has been specifically set up, and we have assumed it is not urged as a defense in itself, but only so far as involved in the other propositions that the plaintiffs were bound to go into the orphans' court, and that if the plaintiffs are barred at law the same bar may be set up in equity:

The other defenses enumerated may be considered together. Here again certain features are involved, the discussion of which we will defer until we come to discuss the measure of liability feature of the case. We will also, by way of prelude, interpolate an explanation, and, so far as called for, a correction of certain findings made which have been criticized by counsel for defendant. The finding was made that shortly before his death John Alexander had parted with control of his property by what has been throughout the case called "an irrevocable deed of trust." When the finding was formulated the trial judge was under the impression that this transfer included all his property.

This was because the deed had been characterized by counsel in the pleadings and throughout the trial as one surrendering his control over what he had. We did not then refer to the deed, and have not now easy access to it, and accept the version of it given by counsel for defendant, that it does not transfer all of the property, and the finding is so modified. It did, however, embrace these 60 shares of bank stock, or, at least, transferred some 90 shares and other property of the grantor.

There was also a finding that this deed had not been recorded, and the comments were made in the opinion filed, which counsel have characterized, as before stated, as "vague and mystifying." We think the impressions of counsel to be wholly due to a misunderstanding of the purpose of the reference to these facts. As then stated, and hereinbefore emphasized, and now again repeated, there was no criticism of the executor, expressed or intended. The fact, however, that the transfer had been made, and the other fact that its existence had not been disclosed by recording or otherwise, had a bearing upon the recognized existence of this trust, and a consequent bearing upon the equities of the bill, just as it has now a bearing (later discussed) upon the measure of liability to be applied in the accounting. It is of no importance whether the deed included other property than this bank stock, and of no real importance whether it was within the recording acts, and unless it did include the bank stock, which was the subject of this trust, of no real importance at all.

The assumption of the trial judge that it included all the property of the grantor carried the further assumption that it included real estate and was within the recording acts. The point is now made that it was confined to personalty, and is asserted not to have been within the recording acts. The only real point made is the purely technical one that it could not be recorded in the sense of being constructive notice. We agree with counsel for defendant that the trust deed is of no importance; but it was in the case, and the early stages of the litigation show it to have been practically, although perhaps not formally, forced into the case by the defendants. If the trustee, in his lifetime, had disposed of the trust property, and the plaintiffs had known of it, this would have had an important bearing upon the question of the duty of the plaintiffs to have accepted this challenge of the existence of the trust. The sole purpose of the reference to it was to make clear that the plaintiffs did not know of it, and that its existence was in effect, although not intentionally, concealed.

We are aware that more space is being given to this feature than its importance merits, but we might as well finish with it. The comments quoted by counsel had reference to this feature of the case with which the trial judge was and still is most strongly impressed. The plaintiffs and the executor have acted toward each other throughout, in the absence, we do not say of candor or frankness, because these words express too much, but without that openness of purpose and with that absence of suspicion which would have brought this controversy to a speedy decision. The echo of this attitude is still with us, because these litigants were unable to agree even upon the simple fact of what dividends the Corn Exchange Bank had paid at

different times. We hasten to acquit the executor and its counsel of all blame for this failure, and we recognize now, what we before expressed, that the temperamental element in this case made the proper rôle of the executor and its counsel a difficult one to play, and we exculpate them, as we have already several times done, of every charge of wrong to the plaintiffs.

Nevertheless the proceedings in this case furnish ample evidence that the executor looked on while counsel for the plaintiffs were groping about in the dark, hunting for such a disclosure of the facts as would enable' them to make an intelligent statement of the rights of the plaintiffs, and volunteered nothing except an at least apparent insistence that the plaintiffs carry their complaint into the orphans' court. How far the executor was right in this insistence we will discuss later. We refer to it now again, not to question the right of the executor to be thus reticent, nor to question that it may have been its duty to so act, but to make the observation that, if the practical effect of it was to embarrass and hinder the plaintiffs (and this we so find), the defendant is entitled to no more than its strictly legal rights growing out of what was done, and the plaintiffs are entitled to every proper excuse for delays, to which the defendant had thus contributed, if not, indeed, caused.

[5] The other defenses referred to may be bunched as the res adjudicata defense. This brings in a discussion of the jurisdiction of the orphans' court and the rights of claimants (other than legatees or distributees of an intestate estate). It is unnecessary to go into this at length, because exhaustively discussed and most discriminatingly considered in the case of Williams' Estate, 236 Pa. 259, 84 Atl. 848. The orphans' court has undoubted jurisdiction over assets of estates brought into that court by executors or other accountants, and its decree of distribution is as binding and conclusive as that of any other court. It, moreover, has the same power as has every court worthy of the name to vindicate and assert its jurisdiction. Nevertheless there may be persons and property with which the estate is concerned, over whom and which the orphans' court has no jurisdiction. The distinction is not unlike that which pertains between the summary and plenary jurisdiction of a court of bankruptcy. If there is property belonging to an estate which is withheld from an executor without color of right, the orphans' court may compel its delivery. Williams' Estate, supra. If, however, both possession and adverse claim of title (not merely colorable, but substantial) was in another, the orphans' court would have in a proceeding adverse to the claimant no jurisdiction of either the person or the subject-matter. Paxson's Estate, 225 Pa. 206, 73 Atl. 1114.

Where a claimant can reduce a property claim to a money claim, in the form of moneys received to his use, and does so, and goes into the orphans' court to have his claim adjudged, that court can exercise jurisdiction. Cauffield's Appeal, 146 Pa. 49, 23 Atl. 163. An executor or other accountant could bring a dispute over property into the orphans' court by the simple expedient of withholding it from his account, and those interested in the estate seeking to surcharge him, and the claimant to the property resisting it.

Where property was asked to be distributed by the orphans' court, a claimant of the property by title adverse to the estate could appear and ask the court to withhold distribution until the claimant had established his right at law, and the court would have undoubted power to grant his request.   By the same token, the court would have the power to decree the surrender of such property to the outside claimant.   This is analagous to reclamation proceedings in bankruptcy, and was one of the points ruled in the Williams Case.

A creditor of the decedent having a simple claim of debt could, of course, go into the orphans' court, prove his claim, and secure an award.   All this is clear enough.   The right of such claimant, however, to pursue any other remedy he may have, is just as clear.   A creditor may bring his action at law to reduce his claim to judgment.   A ward or legatee, or the beneficiary of a trust, may (outside of proceedings in the decedent's estate) compel an accounting by the executor of a deceased guardian, administrator, or other trustee, or in a proper case file a bill in equity for such accounting, or an action of replevin or other appropriate proceeding might be brought.   Indeed, in some classes of cases this might be required of the claimant.   If the accounting involved the administration of an estate other than that being distributed by the orphans' court, the accounting must be had in the court having jurisdiction of that first estate, and in no other way could the claimant establish his claim.

There is not only no conflict of jurisdiction involved, but in cases in which the orphans' court has jurisdiction it will not always exercise it, but will send the parties into a court of law, and sometimes it is required by statute to so send them.   We get out of what has been stated three thoughts:   (1) That there are matters and parties of which and over whom the orphans' court has exclusive jurisdiction;   (2) there are other matters and parties where the jurisdiction is concurrent;   and (3) there are matters and parties where the jurisdiction is acquired by the submission of the rem and the person to the jurisdiction of the orphans' court.   The third proposition must not be confused with, and must be so understood as not to be in conflict with, the other doctrine that, if a court does not have jurisdiction, the parties cannot by agreement confer it.

Just at this point we wish to clear up another misunderstanding by counsel of the ruling made in this case.   We had no thought of ruling, nor do we think the language used conveys the thought, that the orphans' court would not have had jurisdiction of the present contention, if the parties had chosen to submit it in any appropriate form of claim.   What was said as to adverse claims and the jurisdiction of the court was said with reference to the principle laid down in Okie's Appeal, 9 Watts & S. (Pa.) 156, and with that and kindred cases in mind.   The difference between counsel and the court seems to lie in this:   We do not doubt (as counsel has erroneously supposed) that the orphans' court would have had jurisdiction, had the plaintiffs submitted to it a claim of indebtedness against the estate, had such a claim been submitted; but we do refuse to find (what counsel seem to argue for) that the plaintiffs were bound to so submit their claim. We hold that neither before nor after this stock was administered and

distributed were the plaintiffs bound to forego their right to have an accounting by their trustee. On the contrary, it was their right to choose the forum. To clearly present this feature, we will discuss it with all questions of laches eliminated and as if the plaintiffs had filed their bill at once.

We hold their right to have been, inter alia, (1) to have done what the executor insisted they should do, submit their claim to the orphans' court as a money claim against the estate; (2) brought an action in assumpsit for money had and received to their use, to recover a judgment; (3) agreeing with those concerned and with the executor that the ownership of this stock should be determined by the executor formally refusing to account for the stock and the court being asked to surcharge the executor, or by equivalent proceedings indicated in Williams' Estate, supra; or (4) by filing a bill to compel the trustee (through his executor) to account for the property belonging to the estate. The legal consequence of each of these moves would have been: (1) The orphans' court would have received proofs of the plaintiff's claim and have awarded at the audit of the estate whatever was allowed; (2) the plaintiffs would have presented at the audit their judgment in proof of their claim, and this (subject to the res inter alios acta principle) would have been accepted by the orphans' court as conclusive of the amount due plaintiffs; (3) the orphans' court would have heard the evidence and made its award thereunder; and (4) the plaintiffs would submit the decree secured in the proceedings in equity (if a money decree) with the same effect as if it had been a judgment at law. If (what is not in this case) the decree of the chancellor compelled the executor to deliver up specific property, the executor would ask to be relieved from accounting for it in the orphans' court. If, pending a decision in (2) or (4), the orphans' court were asked to distribute the property, the plaintiffs could petition that court to withhold distribution. If they did not so ask, or if the court refused, plaintiffs would be confronted with the precise question which defendants now present.

The orphans' court was not applied to in this case, and the stock which constituted the corpus of this trust estate was sold and distributed by decree of the orphans' court. What is the legal effect of this decree upon the right of the plaintiffs to a decree for an accounting? If we were asked for a decree that the executor deliver this stock to the plaintiffs, inasmuch as such decree could only operate through an order upon the executor as the individual who had and was to transfer the property, the decree of the orphans' court would protect the executor, and the decree asked of this court would be denied, for reasons which we think are obvious. As, however, the decree asked for is a money decree, and a finding simply of the sum due on the accounting, we see in the decree of the orphans' court no hindrance to such a decree being entered by this court.

We have advisedly confined the question to the *legal effect* of the decree of the orphans' court because this, as before intimated, may be a different thing from the practical consequences. If the whole estate of a decedent be distributed before a creditor secures payment of his money and there is no other estate, he is in the same situation

of any plaintiff who has secured a judgment, but is unable to find any property of the defendant out of which to satisfy. The latter fact is no more reason for denying judgment in the one case than the other. If there are assets still in the hands of the executor, or after discovered assets are found, he can present the judgment as proof of his claim, and this judgment (subject to the qualification before stated) would be conclusive of the liability and the amount. There is nothing inconsistent or conflicting in the two decrees. If the decree of the orphans' court was too soon for the plaintiffs' purposes, that was due to their delays, not to the diligence of the court.

The res adjudicata principle upon which one branch of the defense is based has no application. The orphans' court never did adjudicate the question now presented, and full effect can be given to both decrees. That the orphans' court had jurisdiction to make an adjudication does not prove that they did. What it did decree was that the executor sell and transfer certain assets of the estate. This the executor has done, and what was thus decreed cannot be disturbed by the plaintiffs, or by any one, except through and by an application to that court. This decree will, however, in no way interfere with that court at a second audit of the estate, should there be one, giving full effect to any final decree of this court, and awarding the remaining assets of the estate as it may deem proper. To sum it all up: The decree of this court has no other effect and is in no wise different in this respect from a judgment which the plaintiffs might have obtained in an action at law in the common pleas, and is not otherwise affected by the decree of distribution in the orphans' court.

[6] Another branch of defense is that after the sale of this stock the executor, no longer being in possession of the res, cannot be called upon to account, and that the claim of the plaintiffs became one of a creditor only, and their only remedy that of securing a judgment in an action at law. For this are cited Thompson's Appeal, 22 Pa. 16; Lebanon Estate, 166 Pa. 622, 31 Atl. 334; Commonwealth v. Tradesman, 250 Pa. 372, 95 Atl. 574.

We see no value in this defense, and none is probably meant to be asserted beyond that of the statute of limitations, which has already been discussed. The proposition as laid down, however, is far too broad. As an assurance against an overstatement of what the position of counsel for defence is, we quote the language in which it is stated. This is that, when there is no longer possession of the specific property belonging to the trust estate, the claim of the cestuis que trustent is that "of a creditor only, and their only action one at law," and that a trustee, or at least the estate of a deceased trustee, is not "bound to account when he has not possession of the res."

There is involved in the position of counsel another one, not stated, which has merit, to wit, that if the cestuis que trustent resort to an action at law (to which, of course, they could resort, if they so elected) the statute of limitations might in a proper case be successfully pleaded, and the further position that, where the statute would be a good defense at law, the same defense in principle may be interposed in equity. This, however, is an "if" proposition, and not the one

before us. The question is, in its broadest form, whether a trustee, who has sold the trust property and converted the proceeds to his own use, is thereby relieved from his obligation to account, and is subject only to an action in assumpsit. The statement of the proposition would seem to carry with it its own refutation. It certainly would not apply to a defaulting executor, whether the executor himself, or his executor, if he were deceased, was cited to account, because the accounting there must be in the orphans' court. We think there is the same liability to account if the accountant, instead of being an executor and required to account in the orphans' court, were the kind of a trustee who could be required to account in the court of common pleas sitting either (under the Pennsylvania system) as a court of law or in equity. Here, again, the accounting might be of such a character and of such complexity as to compel a resort to equity. There might, of course, be this difference: That the obligation of the trustee was such as that the cestuis que trustent could waive their right to an account and sue in assumpsit.

The question before us is a very different one, not whether they might sue in assumpsit, but whether they were bound to do so. In other words, whether a defaulting accountant (or his executor) could deprive them of their right to an accounting. The answer would seem to be so clearly indicated as not to require statement. None of the cases cited indicate anything to the contrary. The rulings there made were based upon the physical fact (rather than upon any legal principle) that the trust property had disappeared or could not be followed.

The necessities of the case required the court to find that the cestuis que trustent could not take any specific property, but must content themselves with a money claim, and such money claim gave them no priority of payment out of general funds over other creditors. It is proverbial that "necessity knows no law." This, therefore, is a practical result finding, and not a ruling that the *legal effect* was to limit the rights of the claimants.

The ruling heretofore made by this court, which seems to be thought to have some bearing, clearly has none. The ruling was that no successor would be appointed to a trustee, where there were no duties to be performed and the trust had become a mere "dry trust," and where the property formerly held in trust had become the property of the beneficiaries. The reasons for so ruling are obvious.

[7] This brings us finally to a finding of the proper principle upon which the accounting is to proceed, or, if this were an action at law, the proper measure of damages. We have already indicated what we think to be the proper principle. We find ourselves unable to agree with the views of either party. They both seem to us to be wrong, or, in the favorite expression of a famous character in Silas Marner, to be "both right and both wrong." They are both wrong in the view in which they seem to be in accord that the act of the executor in disposing of this trust property has the same legal effect as if the trustee had himself converted it to his own use.

The plaintiffs assert that they are within the principle laid down in

Montgomery v. Reese, 26 Pa. 143. Were this an action for damages against John Alexander for the wrongful conversion by him of the property of the plaintiffs, the principle applied by counsel for plaintiffs might be invoked. Its application to this case under its facts would affront the sense of justice of any one. An illustration is afforded by the demand for "dividends plus interest and compound interest," and for stock privileges given after the stock was sold.

[8] The theory of fact upon which the plaintiffs were permitted to recover was that their father held this stock for them, and that they consented to his retaining the dividends received to be held for their use against a rainy day. He was acting solely for their good, without compensation or other profit to himself. They made no demand upon him for the money, or even suggested that they desired the arrangement made for their benefit to end or be changed in any way. Because he did this helpful act for them, the suggestion that he be mulcted for it by being required to pay to them more than what of theirs he has is a repellant thought. There would, of course, be some equity in the other thought that he should hand over what he had received with its accretions. The demand of the plaintiffs that he do more than this partakes too much of "the cake and penny too" characteristic. Had the decedent converted to his own use property which he held in trust, and attempted to keep it to himself by repudiating the trust, his cestuis que trustent could demand from such trustee the highest value of that of which he had deprived them, or the greatest possible sum he had received from its detention. The cost to the beneficiaries of the benefit of this rule would be that, the trust relations having been ended and repudiated, they must establish their rights within the time limit prescribed by the statute of limitations for actions at law and the doctrine of laches in equitable proceedings. The very familiar saying that "a party cannot blow hot and blow cold at the same time" applies to these plaintiffs. Had it been found to be the fact that the father in this case had broken faith with his children, so as to subject him to the measure of liability now asked to be applied, they would have lost out altogether, because they would have convicted themselves of laches many times over. Having been acquitted of laches on the theory that the father held for them under an acknowledged and recognized trust up to the time of his death, and that there was because of this no requirement on their part to bring an action or file a bill in equity, and in consequence no date from which a statute of limitations would begin to run or laches attach, they surely cannot now be heard to demand an accounting on the theory of an opposite state of facts.

The situation presented as a concrete case is this: Had the case been tried on the theory of a tortious conversion of trust property by the trustee, the call upon the beneficiaries to assert their rights would have begun, and they clearly would have been out of court by their failure to assert them. The case was, however, tried and ruled upon the opposite theory and finding of facts that the trust existed and was recognized and acknowledged by the trustee up to the time of his death, and hence there was no need for the cestuis que trustent, and no call upon them, to do anything to establish a trust which was not denied,

and hence no laches on their part. Having so found, we surely cannot yield to a demand that we now reverse the finding and award an accounting on the basis of an opposite finding of facts. Such a reversal, if we did so yield, would lead to a dismissal of plaintiffs' bill.

Counsel for plaintiffs seem to be strongly imbued with the thought that the executor did a wrong thing in not recognizing the existence of the trust and the ownership of the plaintiffs in these shares of stock, and that in consequence the estate must be visited with all the consequences of an attempt by a trustee to convert the trust property. In other words, he treats the estate (represented by the executor) as if it were the original trustee, and because certain accounting liabilities would have been visited upon a trustee for such bad conduct, the same consequences are visited upon the estate. The fallacy lies in ignoring the fact that there was nothing tortious or wrong in what the executor did, because it parted with the property in obedience to the decree of the orphans' court; and if the practical consequences resulted in loss to the plaintiffs, they themselves brought this about by not sooner asserting their rights.

[9] It only remains to consider the bearing which the fact of the indebtedness of John S. Alexander and of Archibald A. Alexander to the estate has upon the present decree. We have already found that indebtedness to be ——————, and $3,500, respectively.

The length of this opinion is already so great that we have room only for a statement of our conclusion. They clearly have no bearing upon the accounting balance to be found, because these counterclaims are not within the well-known principles of a set-off. At the same time, none of these plaintiffs can be heard to ask that equity be done them without themselves being willing to do equity. The principle invoked, therefore, is that none of them should be permitted to take anything out of the funds of the estate until the one receiving has paid into the estate what he owes. Nothing, however, can be taken out of this estate by the plaintiffs, except through and by a decree of the orphans' court. When, therefore, further assets of the estate (if there should be any) come to be distributed, if the situation presented is that some of these claimants by this decree are shown to be entitled to a certain sum, and are shown also to be indebted to the estate, the court distributing the fund for distribution will apply the proper principle by its decree. It may, of course, turn out that there is no estate out of which the judgment now rendered can be realized. If so, the plaintiffs are in the position of having secured a judgment which they cannot collect, because they delayed the presentation of their claim so long that all the assets out of which they might have been paid have passed beyond their reach.

We therefore confine ourselves to the one matter before us, which is to find the sum which upon an accounting by the trustee or on his behalf is due the plaintiffs. This is done in the formal decree filed herewith.

## Decree.

And now, February 8, 1917, this cause came on to be heard for an accounting, and to be further heard in such accounting at this term

and was argued by counsel; and thereupon, upon consideration thereof, it was ordered, adjudged, and decreed (in accordance with equity rule 71 [198 Fed. xxxviii, 115 C. C. A. xxxviii]) as follows, viz.:

1. The prayers of the bill filed in said cause for decrees against the Fidelity Trust Company (individually), Corn Exchange National Bank, and Lucien H. Alexander, three of said defendants, are denied.

. 2. The said bill is dismissed as against said Fidelity Trust Company as an individual defendant, with costs to said Fidelity Trust Company.

3. The said bill is dismissed as against the said Corn Exchange National Bank, one of said defendants, with costs to said Corn Exchange National Bank.

4. The said bill is dismissed against Lucien H. Alexander, one of ` said defendants, without costs.

5. John Alexander, in his lifetime and at the time of his decease, had . and held 60 shares of the capital stock of the said Corn Exchange National Bank (represented by certificate No. 562) in trust for the plaintiffs, together with all dividends paid by said bank thereon since the dividend declared and payable in May, 1877, for which he, in his lifetime, and said Fidelity Trust Company as his executor, since his decease, was liable to account as such trustee to the plaintiffs as beneficiaries of said trust, and the prayer of said bill for an accounting by said executor is granted.

6. On said accounting so decreed there is found to be due by the estate of John Alexander, deceased, to said several plaintiffs the respective sums following:

Archibald A. Alexander, assignee of John S. Alexander..............$2,735.00
Archibald A. Alexander.........................................$2.735.00
Mary C. Alexander..............................................$2,735.00

—or a total sum due by said estate of $8,205, together with interest on said respective sums from July 24, 1896. This decree is to operate as a decree solely for the payment of money; it being further decreed that the said plaintiffs recover of and from the estate of the said decedent the sums above mentioned, respectively, with interest.

7. The said plaintiffs are further allowed their costs, to be paid by the estate of said decedent.

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes